# SENTENCING SUBMISSION

U.S. v. Michael Arnstein
17-Cr-570(ALC)
Hon. Andrew Carter
United States District Judge
Southern District of New York

Submitted by:
Steven L. Brounstein
32 Court, St., Suite 408
Brooklyn, NY 11201
(718)875-5700
sbattylaw@gmail.com

## Introduction

I respectfully submit this sentencing memorandum with the attached exhibits as my sentencing submission on behalf of my client Michael Arnstein who is scheduled to be sentenced on October 19th.  Mr. Arnstein waived indictment and pursuant to a plea agreement and pled guilty before the Court on September 15, 2017 to a one (1) count information charging him with 18 USC 371, conspiracy to forge a judge's signature.

## The Guidelines and the Defendant's Objections

I have reviewed the Pre-Sentence Report (PSR) with my client and we have a number of objections thereto. Initially, our objection to the PSR is premised on the finding in par. thirty one (31) that the base offense level is sixteen (16) pursuant to USSG 2X1.1, 2J1.2(a) and (b)(3). ; instead we submit that the base offense is fourteen (14) pursuant to USSG 2J1.2.  In fact, the Plea Agreement to which we were a party contemplates a base offense level of fourteen (14) pursuant to USSG 2J1.2(a), as well. The Probation Department includes a two (2) level upward adjustment pursuant to USSG 2J1.2(b)(3) in their base offense level calculation. It is the position of the Probation Department that the adjustment is warranted because "the offense involved the alterations or fabrication of a substantial number of documents and was otherwise extensive in scope, planning and preparation"  The Government, while not propagating (16) sixteen as the appropriate base offense level, does agree with the inclusion of

1

enhancement and that is reflected in the plea agreement. We disagree with the enhancement [1]. Mr. Arnstein's conduct in this matter was not extensive in scope---- it involved similar documents with one goal removing a set of damaging, defaming false URL's from Google. The physical alteration of the documents was simply done, utilizing an inexpensive piece of software that can be purchased and used by anyone. The URLS's that were the subject of the forged orders all contained similar false, fraudulent and defamatory information regarding Mr. Arnstein's company. The scope was targeted and minimal. When the URL's were delisted, Mr. Arnstein ceased his activity. His actions were specifically limited and targeted in scope.

The net effect of eliminating this enhancement would result in a one (1) level benefit to Mr. Arnstein because with no enhancements the base offense level is fourteen (14). He would then receive a two (2) level reduction for acceptance of responsibility pursuant to USSG 3E1.1(a). Accordingly it is our position that the appropriate adjusted offense level is twelve (12) resulting in a guidelines sentence of ten (10) to 16 (sixteen) months, placing him in Zone C. However, given the very unique circumstances of this offense, Mr. Arnstein's clear and expeditious acceptance of responsibility, his desire to cooperate, and his exemplary background we urge the Court to sentence Mr. Arnstein a non-guidelines sentence that does not punish him with any period of incarceration.

Our next objection to the PSR is that paragraph sixty one (61) indicates that Mr. Arnstein has a gross income of $400,000.00 a month. The PSR is clearly in error. Tax

---

[1] The parties agreed to disagree over this enhancement.

returns were submitted to the Probation Officer and Mr. Arnstein met with the
Department of Probation.  The $400,000 monthly income figure is the gross income to
his company which does not take into account employee wages, costs of goods,
manufacturing, and other obligations  related to the business.  Mr. Arnstein estimates
that his take- home pay for 2106-2017 was approximately $120,000.  We did notify the
Probation regarding this error, but it has not been corrected.  I examined the financial
affidavit Mr. Arnstein submitted to the Probation Department. When asked to list his
business's gross income he indicated that the gross was $400,000 while the net can
vary from months where the business lost $100,000 to when it made $100,000.  During
the time that Mr. Arnstein was involved in the dispute that prompted his conduct that is
the subject of this proceeding, his company in fact, lost money.   The $400,000 figure is
grossly inaccurate and inconsistent with the modest lifestyle Mr. Arnstein lives. We ask
the Court to disregard the figure proffered by Probation.


## The Statutory Sentencing Factors Pursuant to 18 USC 3553(a)


The guidelines are only one factor the Court is as the Court is required to
consider in making its sentence determination.  18 U.S.C. 3553(a), reads in part;
Factors to be considered in imposing a sentence --The court shall impose a sentence
sufficient, but not greater than necessary, to comply with the purposes set forth in
paragraph (2) of this subsection. The court, in determining the particular sentence to be
imposed, shall consider--

      (1)   the nature and circumstances of the offense and the history and

3

characteristics of the defendant;

    (2)    the need for the sentence imposed;

            (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

            (B) to afford adequate deterrence to criminal conduct;

            (C)to protect the public from further crimes of the defendant; and

            (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established for-.....

    (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

The PSR, however, fails to detail the extraordinary history that led my client to engage in this aberrant behavior which is very relevant when considering "the nature and circumstances of the offense and the history and characteristics of the defendant" as delineated in 3553(a)(1).  Mr. Arnstein unequivocally accepts full responsibility for his conduct.  He fully comprehends that his conduct was illegal, immoral and strikes at the integrity of the justice system.  He is deeply remorseful for his conduct, and understands that despite the circumstances that prompted him to act—that his conduct was wrong and unacceptable.  He grieves over his improper reaction to these extraordinary circumstances and his conduct, and is hopeful that this Court will show him mercy.  Additionally we want to stress to the Court that Mr. Arnstein or his company received no financial gain as a result of is conduct, his motivations were purely defensive in an effort to save his business from the invidious and illegal conduct of others who were beyond the reach of the law.  In an effort to resolve this matter prior to Mr. Arnstein's plea of guilt, we provided the Government with documents substantiating

4

much of what we state herein.  The purpose of providing them to the Government was to try and resolve this matter without a plea of guilty.  Clearly I failed in that effort and am not going to burden the Court with these documents.

Mr. Arnstein is forty one (41) years old.  He is married and has three (3) children. He resides in Yonkers, New York while his family resides in Hawaii.  The reason for the separation is the travel restrictions that were placed on him as a result of his bail and the nature of his business travel.  I have enclosed letters from his family members recognizing his error while attesting to his good character (Exhibit A).  Mr. Arnstein has absolutely no prior connections with the criminal justice system.  Mr. Arnstein grew up in the New York area and attended school here.   His only pursuit outside of his business and family is that he is a dedicated long- distance runner and is very involved in the promoting good health to others.  I have attached letters addressed to the Court that describe the public/community service initiatives he has voluntarily engaged into for the purpose of aiding others (Exhibit B).  They detail the sacrifice of time and resources promoting the health of the public .  A number of the letters detail Mr. Arnstein's efforts to promote the Woodstock Fruit festival, which is an event held every summer working with others to improve their physical and mental health.  He is the driving force behind this event.  In a letter written by Michael Oliva , he details the nature of Mr. Arnstein's selfless work in this regard. Mr. Arnstein is a world class marathon runner and recognizes that in order to participate in these events it requires entrance fees. Together with others, he promotes free running events in the Bronx to promote health and exercise in under- served communities for those who cannot afford to enter other

5

races.  He focuses on communities where the incidents of diabetes and obesity are disproportionately high to promote healthy lifestyles to address these long term health issues that ravage families and neighborhoods.  He is dedicated to individuals as well. After Mr. Arnstein completes the New York City Marathon, he goes back to the route to aide Dave Fraser who suffers from cerebral palsy and participates with him until he completes the course. It may be dark and sometimes cold for Mr. Arnstein to do this (particularly after he has run twenty six (26) miles competitively), but he is instrumental in ensuring that  Mr. Fraser complete the race.  This is an act of great human kindness, he does this without seeking accolade or thanks, it is just an act of compassion and decency.

Mr. Arnstein owns and operates the Natural Sapphire Company (NSC) of which he is the President. It is located in the Jewelry District of New York City.  He employs sixteen (16) people in New York and has a satellite office in Sri Lanka where he has an additional twelve (12) employees.  The Natural Sapphire Company (NSC) was founded in 1939 by his grandfather. Mr. Arnstein is the third generation of his family to own and operate this business.  When Mr. Arnstein succeeded his father, he took the business in a different direction, given the advances in technology and growth of e-commerce. NSC makes custom sapphire jewelry for clients all over the world including completed articles of jewelry to other retailers.  They have a world renowned reputation for the quality of the gems and artistry of their work. They had a stellar reputation.  The activities of others have tarnished that reputation along with the fact that it is known Mr. Arnstein throughout Mr. Arnstein's close knot industry that he has pled guilty to a felony.

The precious stones and jewelry business is one that is grounded in old- world

6

traditions.  Agreements with suppliers and wholesalers are not done with written contracts; they are agreed to and instituted by oral promises and handshakes.  The reputation of the individuals and companies throughout the industry is of singular and critical importance-- if an ethical rule or an agreement is violated, the ability to do business is destroyed.  When Mr. Arnstein recognized that the nature of his business had to change to reflect technology including sales through the internet, the manner in which he did business would have to change too.  Modernizing his business to process transactions over the internet, Mr. Arnstein retained the services of Transpacific Software Pvt (TPS) and a website and software developer based in Mumbai, India in 2004.  NSC hired TPS to develop and maintain the code for the software that would allow NSC to engage and thrive in e-commence.  Given that the bulk of NSC business migrated to e-commence, it heavily relied on the expertise of TPS to conduct its business.  TPS was owned and run by Prashant Telang.  NSC over several years paid over $1,000,000 to TPS for its services. TPS developed the NSC inventory management system and its website where an increasing number of NSC sales began to take place.  The software TPS developed for NSC was proprietary in nature and owned by NSC.  Over the years TPS, continued to charge larger fees to NSC, which NSC always paid in a timely fashion.  Despite the larger fees, during the course of the relationship, TPS became unreliable. When NSC voiced displeasure with the decreasing quality and efficiency of TPS services, TPS responded by threatening to "break" NSC's system and thereby halt NSC's ability to engage in commerce.  NSC was held "hostage" in the cyber universe and thus continued to acquiesce to the demands of the vendor, TPS.  In and around December 2010 NSC's website and software systems

7

were further deteriorating and NSC began to look for another vendor to supply assistance and services.

Upon being informed by NSC that TPS services were no longer needed, TPS threatened NSC not with legal action (there was no formal contract and NSC's payments to TPS were current and up to date) but with blackmail indicating to NSC that it could and would do great damage to NSC. NSC in turn and within their legal rights requested a return of its legally owned proprietary software. It demanded that TPS turn over to NSC the software to which it was legally entitled. TPS responded with an extortionate threat of payment that at various times ranged from $150,000 to $1,000,000. If the money was not paid to TPS, NSC threatened to embark on a course of economic terrorism, a promise that was ultimately fulfilled. The ensuing cyber terrorism caused NSC a great deal of harm. NSC tried numerous times to legally address this attack, but failed to quell it, resulting in NSC having to submit to TPS's extortion- laden tactics and demands.

TPS/Prashant Telang was able to coerce NSC because it had been hired to build inventory management software and a public facing website for the sale of gemstones and jewelry (NSC's primary business) and thus had an intimate understanding of every function of these systems. Through third-party and employee verification TPS built a multitude of 'backdoor' controlling access and functions in NSC's internal systems. These 'backdoor' security breaches were meticulously designed and built without any knowledge to NSC. Over a period of approximately 3 months (January through March of 2011) TPS caused a massive amount of harm to NSC. These pernicious attacks included systematic deletion of selective parts of NSC's

8

database. By design this occurred so slowly to mask TPS assault on NSC so that it would not be aware that TPS had access to NSC's internal systems, access to customer information including email and credit card information, and supplier information. In sum and substance, TPS created a secret back door into all aspects of NSC's business and Telang/TPS used that door to wreak havoc on NSC's three-generation long business reputation of integrity.

The systemic deletion of image files, slowly and randomly occurred in a variety of ways, For example, TPS would arbitrarily change prices of products, (i.e. indicate a price 75% below normal) selectively and at random.  TPS installed 'kill switches' that it was able to operate in secret that prevented NSC's inventory software system from being used by selected users at random times to create confusion as to the cause of the issue.  TPS enabled SQL injections, etc. which caused NSC's website to be inaccessible or significantly broken and unusable. TPS installed hidden code in NSC's website that automatically sent hidden confirmation emails directed to Prashant Telang/TPS's personal and alias email accounts.  This enabled Telang/TPS to closely scrutinize and monitor NSC business and customers. Then TPS would anonymously harass clients who ordered from NSC to encourage them to cancel the sale or prevent future business.

One of the most egregious far reaching damaging courses of cyber-terrorism and harassment was the theft of the domain www.NaturalSapphireCompany.com. This domain was purchased by NSC previously in 2004 for customers who forgot to add "the" to NSC's main URL address: 'The Natural Sapphire Company.com'. Telang/TPS stole the URL by taking over the domain registration account to which he had

9

user/password credentials.  Telang updated the ownership registration to include his name. Telang/TPS then created a new website without including the word 'the' --calling it NaturalSapphireCompany.com.  This allowed Telang/ TPS to hijack NSC's business and also allowed him to post malicious defamatory lies about NSC on that site and throughout the web.  The purpose was to divert and dissuade customers and potential customers from shopping with Mr. Arnstein's family business, The NaturalSapphireCompany.com.  Negative reviews online are extremely damaging to all businesses, especially those that migrated from an old school, handshake practice and one that was trying to reinvent itself by creating a new presence in a growing marketplace i.e. the web.  The amount of  falsely created negative reviews were extensive and devastating. Telang/TPS posted approximately 500-600 false and defamatory 'reviews' containing despicable lies about NSC or similar on dozens of popular industry and consumer websites, scam and complaint websites.

In similar fashion Telang/TPS used knowledge web- based business and dependency on reputations to further attack NSC. Throughout 2011 and 2012 Telang/ TPS registered similar URLS's such as TheNaturalSapphireCompany.org / NaturalSapphireCompany.co.uk, and similar names to post patently false and defamatory remarks about NSC. TPS made great efforts to improve the organic rankings (SEO) of these websites so that they were strategically positioned to appear in search engine results next to NSC's URL results.  This resulted in the attribution of this false and negative information to NSC resulting in a continuing effort to destroy and ruin Mr. Arnstein's business.  Similarly Telang/TPS through manipulation and access to NSC's software, would reach out to past customers and send email warnings to them to

10

falsely advise them that NSC was unscrupulous and advised them to never shop with NSC. Many of these customers were told that NSC would be selling credit card information. These past customers were falsely told that NSC was a complete scam operation.  Prashant Telang/TPS even included the customers credit card information to create panic- level fear of NSC and to terrorize NSC's customers.  These actions were designed to encourage customers to report NSC as a scam operation to credit card processors .

In addition to the posting of negative comments, Telang/TPS sought out positive comments made by real customers of NSC on countless blogs, forums, news/media websites, etc that mentioned NSC in a positive and accurate light and manner.  He would then post completely false, malicious, defamatory and unfounded comments about NSC to push them to a less visible location and elevate the false negative ones. t Telang/TPS pushed viewers to review URL's that Telang/ TPS created for the sole purpose of compiling extraordinary lies about NSC, many of which may still be in existence on the web.  The statements promulgated and propagated by Telang/TPS had absolutely no basis in fact and were not submitted by honest individuals or entities. Telang/TPS posted false negative reviews on website throughout the internet, including well known business review websites such as Trust Pilot and Yelp.

Mr Arnstein's company was under full attack and could not defend itself.  Mr. Telang through his referencing of the false negative reviews was able to persuade Wikipedia to take down it NSC's page and access recent "on line reviews" from Trust Pilot and the Better Business Bureau who post unbiased reviews of companies that have an online presence which indicate the true nature of Mr. Arnstein's and NSC

11

business integrity.  NSC honest reviews are of the highest caliber in contrast to the period of time during which NSC was under attack in the cyber world on a daily basis by Telang/ TPS.  Telang also posted false and defamatory reviews on Yelp which resulted in a negative rating. Telang/TPS also persuaded Wikipedia to take down NSC's page claiming that NSC was nothing but a scam and a fraudulent actor.

Telang/TPS modus operandi was to create dozens of false alias on very popular industry chat-forums pretending to be extremely unhappy customers.  Extraordinary efforts were made to mask his identity and fool viewers. Unprecedented numbers of posts were made over an 18 month period.  Telang bragged about his conduct, taunted Mr. Arnstein and threatened the livelihood of Mr. Arnstein and his loyal long- time employees.  This course of conduct persisted on sites throughout the web.  Telang threatened to continue his cyber attack on EBAY and Amazon.  NSC had "web stores" that doing commerce on EBAY and Amazon and were shut down by those entities because of the false statements made by Telang/TPS and NSC was in effect a scam. Mr. Arnstein contacted the FBI about this specific threat .  Telang/TPS tentacles spread throughout the web affecting every area of NSC's web based business. Great efforts to have NSC's URL outgoing emails 'blacklisted' and added to URIBL, UBE/UCE (Unsolicited Bulk and/or Commercial Email registrar) so NSC's emails would be blocked or automatically filtered to recipients spam folders of most major email hosts (e.g.gmail, hotmail, aol, and yahoo).  This was carefully executed so that it remained undetected by NSC for quite a long time.  After NSC discovered these fraudulent reports to URIBL/UBE/UCE the issues were finally resolved with extraordinary effort by Mr Arnstein and NSC.  Telang/TPS continued to work on getting NSC's URL 'blacklisted'..

12

Each effort to resist and repair these heinous assaults on NSC took its toll on Mr. Arnstein his business, his reputation, his employees some of whom sought other employment fearing that NSC would go out of business, and they would lose their jobs. The stress and difficulty in dealing with this had a negative effect on what had always been a congenial and productive work environment. I am enclosing letters from employees and others in the jewelry business who can attest to the disruption caused by these actions and Mr. Arnsteins reputation within the industry (Exhibit C).

Telang/TPS's harassment included impersonating employees of NSC.  He created email addresses using the stolen domain name (NaturalSapphireCompany), pretending to be real employees of NSC,  and emailing NSC's vendors to get information from about NSC's business dealings.  Coupled with his pilfering of the name "Natural Sapphire Company" he would send out emails with names of employees, particularly Mr. Arnstein's manager, "Evan" attaching his name to the emails. This was coupled with a constant barrage of harassing emails and live chats in which NSC would be denigrated and the employees were told that NSC would be going out of business and they would be losing their jobs.  Employees were being cyber attacked on both the receiving and sending side of emails.

Another pernicious activity Telang/TPS engaged in was an activity known as "click fraud".  One of the ways Google bills customer and garners income is by placing a business name at the top of a related search or on the side of the search results.  In addition to paying for that placement every time the searching individual "clicks" on the attached site, Google get a royalty.  TPS openly taunted NSC about the hundreds of dollars per day in false clicks it incurred due to TPS generated false response to NSC's

13

legitimate advertising campaigns.  An established and consistent baseline of NSC's

PPC costs per month prior to attacks by Prashant Telang was $5-6k.  It is

conservatively calculated that TPS's click fraud campaign over a 16 month period

totaled at least $115,000, in additional costs .  NSC had provided evidence to Google's

billing department showing Telang's/TPS's boasts of the attacks, his methods, and how

they had gotten past Google's click fraud filters in an effort to help Google address

criminal conduct by others.  Google refused to credit NSC's account or assist in any

way during this hardship.

Their cyber-terrorism extended to Telang/TPS contacting consumers using

contact information stolen from NSC's customer lists telling customers that NSC is not

protecting customer credit card information.  Receiving information regarding a vendor

is extremely disconcerting given how much commerce is consummated over the web

through the use of credit cards.  Learning that credit card information is not protected or

potentially being disseminated to others is disconcerting to a consumer and is

information that could clearly end the seller- buyer relationship going to the heart of

consumer confidence.

Adding insult to injury, Telang/TPS began to give NSC's proprietary software to

others and then attempted to registered NSC's proprietary software as Telangs/TPS's

own property.  Telang/TPS fraudulently obtained and issued a DMCA to NSC's website

host provider in an attempt to have NSC's website taken down.  This caused enormous

stress and employee hours to fight this false allegation as well.

NSC suffered irreparable damages to its reputation with existing customers and

direct loss of potential customers.  Further NSC suffered near-irreparable loss of

14

confidence from the small and insulated precious gemstone trading community in New York City.  This lack of revenue hindered NSC's ability to make payments to vendors in a timely matter; in addition to the fog of suspicion created from the immense false reviews and rumors within the dealer community. NSC has never been able to fully recover its once perfect credit history within the industry.  One of the oddities of the jewelry business is that goods (gemstones, diamonds, sapphires etc) are generally given to vendors with a handshake.  I discussed this earlier but is important to understand the "old world code" of the jewelry business.  Contracts or notes are signed and written agreements are not entered into.  Transactions are done with a handshake and promise.  If one does not live up to commitments and obligations, no one within the industry will deal with that person or business in the future.  Thus, reputation is everything, once besmirched --a business "out" of the tight knit group.

Mr. Arnstein response to these attacks was to engage an "IT" firm to try and aide him in quelling this act of cyber terrorism and some of the modalities instituted by Telang/TPS (Exhibit D).  He made complaints and met with members of federal law enforcement including the FBI.  They conducted an investigation in good faith but concluded that Telang/TPS were based in India and they had no jurisdiction to pursue Telang, he had no real footprint in the U.S.  NSC contacted the state department, and elected officials seeking their assistance, to no avail (Exhibit E).  He endeavored to get law enforcement in India to take action and hired an attorney in India to aide him in this but the Indian authorities took no action. (Exhibit F).  He tried to get Google to remove these defamatory URL's but Google would not do it.  He retained counsel Brett Lewis Esq. who pursued this on two (2) fronts: he entered into negotiations with Mr. Telang

15

which resulted in Mr. Arnstein paying Mr. Telang a $75,000 extortion payment to cease his illegal conduct.  Additionally, Mr. Lewis did seek relief from the Court in the matter of Walter Arnstein Inc. V. Transpacific Software PVTLtd.et all 11-cv-05079-AN and received a default  judgement with an order directing the fraudulent URLS be de-listed. (See Exhibit G).  Mr. Lewis diligently pursued a civil remedy to aid his client and rid him of this pattern of defamatory conduct that in effect was bankrupting him and ruining his three (3)generation family- run business.  The letters which I previously referenced (see Exhibit E) attest that TPS's conduct threatened the livelihood of his employees, too. I am enclosing a letter from Mr. Lewis which succinctly summarizes  the legal means Mr. Arnstein utilized to rid his business of what can only be characterized as economic terrorism and Mr. Lewis efforts to do that (Exhibit H),.  Without question Mr.  Arnstein made great efforts to pursue his tormentors though legal means, his criminal conduct while inexcusable was a last resort.

After the default judgement was entered and the order to remove certain URL's was served upon Google, it came to Mr. Arnstein's attention that a number of URL's still existed and when Google was asked to remove them they would only do so with another court order. Mr. Arnstein paid Mr. Lewis a substantial amount of money for his thus far successful services and when told that additional legal fees would be required, only then did Mr. Arnstein engaged in the activity which resulted in this conviction.  Out of utter frustration did he make the statement attributable to him on par. 24 of the PSR. As a result of Telang/TPC behavior Mr. Arnstein almost lost is business.  His sales suffered as a result of the false defamatory language that Telang/TPS posted on the web.  He paid over $70,000 in legal fees after paying $75,000 in extortion to his

16

victimizer and was at wits end. Mr. Arnstein spent well over $100,000, in staff time fighting to protect and defend itself against these persistent and varied attacks. As previously mentioned, NSC spent approximately $115,000 in click fraud to Google. Moreover, NSC conservatively estimates lost sales in the range of $500,000 - $750,000 due to its damaged reputation. It took NSC three (3) years to rebuild its software systems and website from the ground up which added $650,000 in costs to address the damage caused by Telang/TPS.

While the loss in income to Mr. Arnstein was devastating, he tried to maintain his staff.  As a result of this, he suffered the financial burden individually.  His employees had been with him for years and he could not have them bear the burden of this war on his business.  Thus, Mr. Arnstein suffered great personal financial distress to the extent that his home went into foreclosure and his personal credit was devastated.

In his frustration, Mr Arnstein contacted a "consulting  firm" posing as attorneys to seek advice on how to deal with this.  That firm suggested to him the notion of preparing these orders.  That firm is currently under a federal investigation emanating out of the United States Attorney's office in the Eastern District of Pennsylvania.  Mr. Arnstein agreed to be interviewed by the supervising FBI agent AJ Pelzcar and answered all of his questions and provided him with what we believe information that may be pertinent to his investigation.  That is why this sentence has been adjourned a number of times. Unfortunately that matter is moving slowly. Mr Arnstein has great anxiety over the sentence possibilities and the patience of the United States Attorney's Office in this district is waning, so all parties felt it was best to move forward.  However it should be clear to the Court, that Mr. Arnstein was ready willing and able to cooperate

17

in any manner requested by the Government. This was motivated by Mr. Arnstein's desire to right his wrong.  Clearly he would have been seeking leniency but that was not his primary motivation.  He is remorseful, contrite and quite frankly extraordinarily worried about his future.

When considering the other factors delineated in 3553(a) in particular subsection (2)(B) concerning deterrence, Mr. Arnstein is unquestionably deterred from engaging in any similar conduct in the future.  His arrest, conviction the restrictions placed on his life and facing a sentence has clearly adequately deterred from any future similar or in fact any criminal conduct.  As far as general deterrence, Mr. Arnstein's arrest conviction and loss of reputation serves as a deterrence to the general public and/or any individual who faced with similar circumstances would act in the manner or take similar action that Mr. Arnstein took.  Mr. Arnstein's reputation and ability to conduct business has been severely effected by his conviction.  He has had difficulty getting business insurance, his sales have dropped because potential customers are have been deterred from doing business with him because of the fear that he will not be able to deliver the items they have ordered.  Suppliers which traditionally sent goods without payment want payment up front now because they to fear that if Mr. Arnstein is incarcerated the company will close and will not get paid.  Without question the collateral consequences of this conviction have been devastating to Mr. Arnstein.   Additionally Mr. Arnstein serves no threat to the general public, he is not in need of any rehabilitation or additional education.

When considering 3553a)(6) I endeavored to look at similar cases in this district.

18

There is dearth of such cases however there is a matter that has some similarity.  In US v. Lichterman 15-cr-302 a matter that was before the Hon John Koetl the defendant issued fraudulent court orders, forged emails purporting to be written by an attorney threatening legal action bordering on extortion and when the attorney discovered the forgeries, the defendant threatened to ruin the attorney's reputation and that of his family.  Unlike Mr. Arnstein that defendant did not resolve his matter pre-indictment and pled guilty only after being indicted.  Although that defendants conduct was much more egregious than Mr Arnstein's, the guidelines comported with the guideline suggested by the defense in this matter.  Notably in that matter, Probation Department did not enhance his guidelines two (2) levels pursuant to USSG 2J1.2(b)(3) as done in this case.  Without question the conduct perpetrated in that case was far more egregious then committed by Mr. Arnstein, yet the Court sentenced that defendant to a period of home confinement and $3,000 fine.  I understand every matter is different and the Court is not bound by this and unquestionably I with great reverence respect the independence of this Court to make its own judgement

I have enclosed and previously referenced several letters from both former and current employees (see Exhibit C) and they all recount several points.  The first is that Mr. Arnstein's presence, guidance and leadership is essential to the operation of this business, that they were aware of the difficulties he faced as a result of the actions of Telang.  Additionally they tell the Court that Mr. Arnstein who has over twenty five (20) employees treats them like family.  They are well paid and cared for.  Mr. Arnstein 's incarceration would have devastating effect on all of them.  I have separated out one letter for the Court to consider (Exhibit I).  Mr. Arnstein's business has an office in Sri

19

Lanka. Sri Lanka is an impoverished company. He has eleven (11) employees in Sri Lanka. In the letter addressed to the Court they indicate that they and the lies of their families are dependent on Mr. Arnstein. He pays these folks a living wage which they may not be able to attain anywhere else. He provides them with leadership and support. Additionally Mr. Arnstein contributes to local schools, hospitals and orphanages. His employees were aware of the cyber terrorism campaign being perpetrated against this company and that but even though this action caused revenues to decline Mr. Arnstein kept them employed. They characterize his conduct as "sav(ing) our lives and protecti(ng) our jobs" They state that Mr. Arnstein as an individual who makes them safe. We ask the court to take these powerful and heartfelt statements into account when considering his fate. These individuals and their families are dependent on Mr. Arnstein's ability to work and pay them

## Conclusion

Michael Arnstein made a terrible error one which we recognizes goes to the heart of the justice system, a place which we who work in hold sacred. He did this not for economic gain or as an affirmative act to harm someone. Prior to committing these acts he tried at great expense, pain and time to work within the system but when he could not, his judgement failed him and resorted to a criminal act. He suffers the ignominy of being a convicted felon, his business stands to be possibly lost upon incarceration and his name and credit has been thrown in the trash. We ask the Court to consider this and sentence Mr. Arnstein to a non-incarceratory sentence .

20

I thank the Court for considering this lengthy submission and the annexed exhibits.

**STEVEN L. BROUNSTEIN**