IAJPARNS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.                            17 CR 570 (ALC)

5   MICHAEL ARNSTEIN,

6              Defendant.

7   ------------------------------x

                                        New York, N.Y.
8                                       October 19, 2018
9                                       10:43 a.m.

10

    Before:
11
                   HON. ANDREW L. CARTER, JR.,
12
                                        District Judge
13

14                        APPEARANCES

15

    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  DANIEL NOBLE
         Assistant United States Attorney
18

    STEVEN LLOYD BROUNSTEIN
19       Attorney for Defendant

20

    ALSO PRESENT:  SPECIAL AGENT RICHARD SMYTHE, FBI
21

22

23

24

25

IAJPARNS

1          (In open court)

2           (Case called)

3          MR. NOBLE:  Good morning, your Honor.  Daniel Noble

4    for the government.  I'm filling in for my colleague, Sebastian

5    Swett, who is on trial before Judge Cote.  With me at counsel

6    table is FBI Special Agent Richard Smythe.

7          MR. BROUNSTEIN:  Steven Brounstein for Mr. Arnstein,

8    who's to my right, your Honor.

9          THE COURT:  Okay, good morning.

10          MR. BROUNSTEIN:  Good morning, your Honor.

11          THE COURT:  We're here today to impose sentence in the

12    case of United States v. Michael Arnstein.  First, let's take

13    care of some preliminary matters.

14          The order that was forged in this case was a court

15    order from a judge in this district.  There's been no request

16    for me to recuse myself.  I don't see any reason for me to

17    recuse myself, but I just figured I'd raise that with the

18    parties, and I can say to the parties I have not spoken to

19    Judge Nathan about this case at all.  But I figured that I

20    would just confirm that there was no request for me to recuse

21    myself.

22          MR. NOBLE:  No, your Honor, not from the government.

23          THE COURT:  Defense counsel?

24          MR. BROUNSTEIN:  Of course not.

25          THE COURT:  All right.  The other thing is I received

IAJPARNS

1    this morning a document from someone, I think it's styled as

2    amicus brief.  I'm not sure it's actually a legal brief.  I'm

3    not sure if the person who submitted it is a lawyer, but

4    counsel should have a copy of that.

5              First of all, let me confirm that counsel have seen

6    that.  Is that correct, counsel for the government and the

7    defense?

8              MR. NOBLE:  Yes, your Honor.

9              MR. BROUNSTEIN:  Yes, your Honor.  Just for clarity

10   sake, I received it last evening, and it was indicated to me

11   that they sent it to the Court.  How they sent it to the Court

12   I didn't know.  I didn't see it posted on ECF, and this morning

13   I made sure that the U.S. Attorney got it sent over to their

14   office this morning.

15             THE COURT:  Okay.  So I want to find out from counsel,

16   first of all, if you want me to consider this submission or not

17   consider this submission.  I guess as a preliminary matter, if

18   you want me to consider it, we can talk about it when we get to

19   the meat of the sentencing discussion.

20             But counsel for the government, what is your take on

21   that?

22             MR. NOBLE:  Yes, your Honor.  I reviewed this

23   submission briefly.  We just received this this morning, and I

24   skimmed it.  It raises mostly what we would characterize as

25   policy concerns that we think are not for this court to

IAJPARNS

1    consider in imposing sentencing on Mr. Arnstein, but we have no

2    objection generally to it being considered, made part of the

3    record, if that's what the defense would like.  So it's really

4    an amicus on their behalf.  So if they have any objection, we

5    kind of defer to the defense.

6          Our position, just to preview for the Court, would be

7    that your Honor should give it very little weight.

8          THE COURT:  Defense counsel?

9          MR. BROUNSTEIN:  Judge, I have no objection.  You give

10   it whatever weight you think is appropriate.

11         THE COURT:  You have no objection?

12         MR. BROUNSTEIN:  I have no objection, your Honor, and

13   as I said, you can give it whatever weights you feel is

14   appropriate around it.

15         THE COURT:  In preparation for today's proceeding, I

16   have reviewed a presentence report, a submission from defense

17   counsel, a submission by the government, as well as this

18   document that we just discussed.

19         Is there anything else I should have?  And again, the

20   submission from the defense had many letters and other exhibits

21   attached to it.  Is there anything else that I should have from

22   the parties?

23         MR. BROUNSTEIN:  Yes, Judge.  Yesterday I wrote a

24   letter to the Court as sort of a supplemental submission,

25   something that I failed to comment on, the recommendation of

IAJPARNS

| | |
|---|---|
| 1 | the probation department.  Did you see that? |
| 2 | THE COURT:  No, I haven't seen that. |
| 3 | MR. BROUNSTEIN:  It was posted yesterday. |
| 4 | THE COURT:  Okay.  Hold on just a second. |
| 5 | THE COURT:  Has counsel for the government seen it? |
| 6 | MR. NOBLE:  Yes, your Honor.  I believe it's a |
| 7 | two-page letter that was submitted by defense counsel. |
| 8 | THE COURT:  Okay.  Hold on a second. |
| 9 | MR. BROUNSTEIN:  I have a copy, if you'd like to see |
| 10 | it. |
| 11 | THE COURT:  Sure.  Can you hand that up to my deputy. |
| 12 | MR. BROUNSTEIN:  Sure.  I apologize for not calling |
| 13 | chambers and alerting chambers to it, your Honor. |
| 14 | (Pause) |
| 15 | THE COURT:  Okay.  I've now reviewed that letter.  Is |
| 16 | there anything else that I should have, counsel? |
| 17 | MR. NOBLE:  Not from the government. |
| 18 | MR. BROUNSTEIN:  No, sir. |
| 19 | THE COURT:  Okay.  To the extent I haven't already |
| 20 | done so, I accept Mr. Arnstein's plea of guilty. |
| 21 | Defense counsel, I know from your submissions that you |
| 22 | have read the presentence report, but let me just confirm that |
| 23 | you read the presentence report and reviewed it with your |
| 24 | client.  Is that correct? |
| 25 | MR. BROUNSTEIN:  I have, your Honor. |

IAJPARNS

1          THE COURT:  Other than what you've indicated as

2     objections to the presentence report, are there any other

3     objections by the defense?

4          MR. BROUNSTEIN:  No, sir.

5          THE COURT:  Mr. Arnstein, have you, in fact, reviewed

6     the presentence report with your attorney?

7          THE DEFENDANT:  Yes.  I have, your Honor.

8          THE COURT:  And have you had an opportunity to discuss

9     any objections that you have to anything in there?

10          THE DEFENDANT:  Yes.  I have no objections, your

11     Honor.

12          THE COURT:  Okay.  Counsel for the government, have

13     you reviewed the presentence report?

14          MR. NOBLE:  Yes, your Honor.

15          THE COURT:  And any objections by the government?

16          MR. NOBLE:  No, your Honor.

17          THE COURT:  Okay.  Let's turn to some of the

18     objections by the defense -- turn to all of the objections by

19     the defense.  First, there's an objection to the guideline

20     calculation.  Let me hear from the government as to -- I guess

21     let me hear from defense counsel some more as to the basis of

22     your objection to that guideline calculation, if you have

23     anything to add.

24          MR. BROUNSTEIN:  Yes, sir.  Judge, the only thing I

25     can add is in responding to what the government wrote in their

IAJPARNS

1    letter to the Court, their submission to the Court -- do you

2    mind if I sit, your Honor?

3              THE COURT:  That's fine.

4              MR. BROUNSTEIN:  And the cases they cited, one was --

5    I think both out of the Eighth Circuit, one was Bakhtiari and

6    the other was Petruk.  Both of those matters -- I read both of

7    those cases, your Honor, and both of those matters involved

8    either a larger scope or more extensive planning than this

9    case.  And most interesting to me, at least, in the case of

10   Petruk, the court, the Eighth Circuit, noted that there's

11   really very, very little law on this.  There's no fractured

12   commentary as to this subsection.

13             I didn't, your Honor, quite frankly, find a case in

14   the Second Circuit.  I did a search.  So it's really one of

15   those situations which I think is better off in the discretion

16   of the trial court, in your discretion.  And all I can say,

17   Judge, is that I suggest to the Court -- and the government

18   kind of almost suggested in their letter to the Court that this

19   is not something that requires great planning, skill or scope.

20   It can be done easily by anybody equipped with a simple piece

21   of software, and in a sense the government is arguing both

22   ways.  On one hand, they are saying they want to deter people

23   because this is easily done, and on the other hand, they're

24   arguing in the guidelines that this is extensive or difficult

25   to do.

IAJPARNS

1          Again, Judge, I didn't go over this point because it's

2     not really the crux of my argument to the Court, and it's

3     always been my practice is to kind of cut to the chase with the

4     Court on what I think are really, really important issues.  And

5     again, Judge, this is just one factor in your determining

6     sentencing on this 3553(a).

7          Although, Judge, I do believe I'm right and the

8     benefit we receive, as I said in my letter to you, is a

9     one-point level reduction because it falls right on the cusp,

10    where you get two or three points for acceptance of

11    responsibility, but I think it's an issue for the Court to

12    decide.

13          THE COURT:  Okay.  Counsel for the government?

14          MR. NOBLE:  Yes, Judge.

15          THE COURT:  And you can remain seated too if you like.

16          MR. NOBLE:  I'm happy to stand as long as the court

17    reporter can hear me and your Honor can hear me.

18          So just for the record, we are discussing the

19    application of 2J1.2(b)(3) and the government and probation

20    agree that the two-level enhancement applies, and we agree with

21    defense counsel.  This is within the Judge's discretion.

22          But there are two separate grounds.  One, is whether

23    the offense involved, quote, the destruction, alteration or

24    fabrication of a substantial number of records, documents or

25    tangible objects, or was otherwise extensive in scope, planning

IAJPARNS

or preparation.  Your Honor, defense counsel essentially argues
that it wasn't a very difficult crime to commit, but we don't
think the level of difficulty is what this enhancement is
getting at.

          The enhancement is getting at the number, the quantity
of records that were fabricated -- this is under the
obstruction of justice guideline -- or whether it was extensive
in scope, planning or preparation.  And here, we think the
enhancement applies under either or both of these provisions.

          With respect to the number of documents, we're talking
about 12 separate forged court orders, all bearing Judge
Nathan's signature, and it took place over a time period of
almost three years.  I believe the first order, the planning,
began in May of 2014, and I think it's relevant to note that
Mr. Arnstein engaged one of his employees to assist him in the
efforts; so he's bringing other people into the endeavor.

          They used a computer software program to alter the
court order to make it appear legitimate.  That included
changing the date and the stamp on the order itself, as well as
altering the URLs that they were seeking to have Google delist.
So again, the planning for that began in May of 2014.

          I believe it was submitted to Google in or about
October of 2014, and that was just the first court order.  And
then the conduct continued until at least February of 2017.  So
we're talking about an almost three-year period over 12 court

IAJPARNS

1    orders.

2            In terms of planning, again, we think it did take some

3    planning and it was extensive in scope.  He had to involve the

4    use of another employee, and he also apparently consulted with

5    someone on the outside, in Pennsylvania, about how to do this.

6    So although it wasn't a difficult crime to commit ultimately,

7    in terms of altering the order and submitting it to Google, it

8    was extensive in scope, and it did involve a great number of

9    forged court orders.

10            And so, therefore, we think that it applies and we

11    know, you know, probation agrees that it applies as well.

12            THE COURT:  Okay.  I am not going to apply the

13    two-level enhancement.  While the document is certainly

14    important, I don't think 12 is a substantial number of

15    documents.  While there certainly was some planning involved, I

16    don't think that the planning was extensive, and certainly

17    while this occurred over the course of several years, I don't

18    find that that's extensive within the scope -- within the

19    meaning of that guideline enhancement.

20            So I will not apply that enhancement.  The base

21    offense level is 14.  There is no enhancement.  There is a

22    two-level reduction for acceptance of responsibility, which

23    takes the total offense level to 12, and criminal history

24    category I.  That results in a guideline range of ten to 16

25    months' imprisonment.

IAJPARNS

1              Other than what's already been stated in terms of that

2       guideline objection, is there any objection to that guideline

3       calculation by the government or the defense?

4              MR. NOBLE:  No, your Honor.

5              MR. BROUNSTEIN:  No, sir.

6              THE COURT:  Okay.  Now, let's turn to some of the

7       other objections by the defense.  There was an objection

8       regarding Mr. Arnstein's financial status.  There was an

9       objection to paragraph 61 that indicated that he had an income

10      of $400,000 a month.  I'll note that while the presentence

11      report sets that out in paragraph 61 and 62, when his monthly

12      income is reported on page 13 in paragraph 64, the total

13      monthly income is listed at $150,000.

14             I understand that defense counsel still feels that

15      that is too high, and defense counsel has indicated that

16      Mr. Arnstein's yearly income is closer to $120,000, but I'll

17      hear more from counsel about that.  Let me hear from the

18      government first on that.

19             MR. NOBLE:  Your Honor, we don't have any independent

20      information.  This is based on the financial affidavit that the

21      defendant submitted to probation; so he and his attorney are

22      making a representation to the Court and probation that these

23      figures are accurate.  We don't have any independent evidence

24      to contest it; so we're kind of relying on defense counsel's

25      representations.

IAJPARNS

1      MR. BROUNSTEIN:  That's fine, Judge.  Just so you

2  know, I did take a look at his tax returns, and I think my

3  statement is accurate.  I think my statement is accurate.  I'll

4  leave it at that.

5      THE COURT:  All right.  So what is the government's

6  position?  What do you want me to do?

7      MR. NOBLE:  Judge, I read defense counsel's

8  submission, and it said the income is $120,000.  I take it

9  defense counsel's representing to this Court that Mr. Arnstein

10  only makes $120,000 per year.  Just to clarify that that's not

11  the monthly amount that he makes?

12      MR. BROUNSTEIN:  Correct.  That's accurate, your

13  Honor.

14      MR. NOBLE:  So I mean, I think we need then an

15  accurate representation to the Court.  If it's $120,000, I take

16  it that's $6,000 per month gross income, and then from that, I

17  guess we have to recalculate the monthly expenses.  It sounds

18  like, in that case, he would have a negative cash flow per

19  month of approximately $2,150, which frankly on the face of it,

20  given that he has $3 million in net assets seems, frankly, a

21  little unbelievable that he's running himself into the ground

22  $2,000 per month.  But again, we're kind of relying on defense

23  counsel to make accurate representations to this Court.

24      THE COURT:  Again, I know that as lawyers we're not

25  necessarily required to be great at math.  I think you may have

IAJPARNS

1   indicated that you thought the gross monthly income would be

2   $6,000.  I think if, in fact, his gross annual income is

3   $120,000, I think you might have cut that a little bit off.  I

4   think it's $10,000 gross.

5           MR. NOBLE:  I'm sorry, Judge.

6           THE COURT:  That's fine.  So it would be $2,000 income

7   instead of $2,000 running in deficit there per month.  I think

8   that's the right math, off the top of my head.

9           MR. NOBLE:  You're right.  I'm a lawyer, not a

10  mathematician.  I'm sorry I fudged that.

11          MR. BROUNSTEIN:  I'll stand on the record, your Honor.

12  I don't think it's that important an issue.  The only reason I

13  raised it to the Court is I just thought that, given my

14  examination of his tax returns and speaking to him, I think

15  that that was more a mistake by probation taking a look at

16  his -- the gross income that his company takes in a month

17  without considering some of the expenses.  But again, Judge, I

18  didn't consider this to be -- I didn't consider this to be a

19  major issue.  I just wanted to raise it to the Court.  That's

20  all.

21          MR. NOBLE:  Judge, we agree that it's not super

22  material to your Honor's consideration of an appropriate

23  sentence here, given I think the representation that he still

24  has net assets of approximately $3 million.  I think even

25  taking that into account, and what would then be a positive

IAJPARNS

cash flow of approximately $2,000 per month means that he's in a position to pay a fine, and I think that's what we're getting at here.

          There's no forfeiture.  There's no restitution. Probation has recommended a guidelines fine of $25,000, and to preview for the Court, we believe that a guidelines fine is appropriate here as well.  And so even taking into account the corrections, I believe that there's -- Mr. Arnstein has sufficient assets in cash flow to pay a fine.

          THE COURT:  Okay.  So what do counsel want me to do about what is listed in the presentence report?

          MR. NOBLE:  Yes.  So in the presentence report, I would take it Mr. Brownstein would request that we change the monthly cash flow to $10,000 per month, such that the net cash flow for each per month, taking into account Mr. Arnstein's personal expenses, would be approximately $2,000 per month.

          THE COURT:  All right.  And defense counsel, is that what you wish to do?

          MR. BROUNSTEIN:  Yes, sir.

          THE COURT:  Okay.  So I'll make that correction to the presentence report.  Let's change the total monthly income on page 13, paragraph 64 to $10,000 based on defense counsel's representations, and then the total monthly cash flow will be, I think, $1,850, I believe, but that's just off the top of my head.  So let's make that change.

IAJPARNS

1      There were some other corrections, I believe, that

2  defense counsel -- in the recent letter, defense counsel wanted

3  me to, I guess, change the portion of the presentence report

4  that indicates that Mr. Arnstein forged the court's orders to

5  remove negative reviews by customers, and basically indicate

6  those were negative reviews by a disgruntled former software

7  engineer, as opposed to customers.  What's your take on that,

8  counsel?

9      MR. BROUNSTEIN:  Your Honor, that was my objection, is

10 that -- you know, most of what I had -- a lot of what I had to

11 say to the Court in my submission dealt with my client's action

12 here was sort of a reaction to what was going on.  He didn't do

13 this to make his business flourish.  He didn't commit this

14 crime to eliminate truthful negative reviews.

15      He committed this crime to eliminate what I have to

16 say is a bleeding that was occurring to his company, and I

17 think the characterization -- look, the government and I can

18 disagree on a lot of things, and I understand that.  And

19 sometimes, you know, they're right and sometimes I'm right.

20 But I think probation -- and we make reasonable arguments on

21 both sides, and I credit the government for that.  But

22 probation is just wrong here, and when I read that yesterday,

23 you know, I --

24      THE COURT:  How about this, before we get into all

25 that, and right now we're just dealing with the factual

16

IAJPARNS

1    assertions in the presentence report.

2              MR. BROUNSTEIN:  Yes, sir.

3              THE COURT:  Very soon we'll get to what that means.

4              MR. BROUNSTEIN:  Yes.

5              THE COURT:  What if we just simply, on page 19,

6    indicate that Arnstein forged the court's order to remove

7    negative reviews by customers on internet search engines.  What

8    if we just delete that last phrase there and simply say "to

9    remove negative reviews," period?

10             MR. BROUNSTEIN:  That's fine with me, Judge.

11             THE COURT:  Government?

12             MR. NOBLE:  No objection, your Honor.

13             THE COURT:  Okay.  Let's make that change.

14             Were there any other objections to anything in the

15   presentence report by defense counsel?

16             MR. BROUNSTEIN:  Judge, are we talking about the

17   presentence report or the recommendation as well?

18             THE COURT:  The presentence report.

19             MR. BROUNSTEIN:  Nothing your Honor, no.

20             THE COURT:  Okay.  All right.  So then, with those

21   corrections, I will adopt the presentence report.

22             I'll hear from counsel regarding any issues they want

23   to raise about the appropriate sentence, and I'll give

24   Mr. Arnstein an opportunity to address me, if he likes.  He

25   doesn't have to.

IAJPARNS

1          I would like counsel to, in addition to whatever else

2     you plan to say, to focus on the fact that Mr. Arnstein,

3     according to the presentence report, ordered one of his

4     employees to help carry this out, how that plays into my

5     consideration of general deterrence, as well as what

6     Mr. Arnstein said after he committed these forgeries in terms

7     of his e-mails, which seem to be bragging about what he had

8     done and how easy it is to do, and how it's a -- basically a

9     good idea, weighing the costs and the benefits because he saves

10    so much money and time by doing it this way, and how that

11    weighs into my consideration of general deterrence.

12          So I'll hear from defense counsel.

13          MR. BROUNSTEIN:  Judge, I'll address that first, but I

14    will come back to it.  After all the effort, since I'm going to

15    discuss that, that Mr. Arnstein had made to deal with this in a

16    legal manner, he did receive some advice and some information

17    from a company that is currently being investigated regarding

18    the meaning of these orders.

19          Now, he knew what he was doing was wrong, and he

20    sought the assistance of an employee, who also had gone

21    through -- it's in the letter, Judge, which indicates the

22    extent of the employee's role, was having an extremely

23    difficult time with this issue.  The company was being

24    bombarded.  Some of them -- their e-mails were also -- names

25    were being changed.  They were receiving false e-mails from

IAJPARNS

1  other individuals, and I think the one letter from someone who

2  worked him left because of this and the stress involved.  He

3  actually, although he loved his work and respected Mr. Arnstein

4  and felt that he was well paid, is that the stress of what was

5  going on with this bombardment was just too much for him.

6          So in terms of general deterrence, Judge, I think that

7  Mr. Arnstein, as he stands here today, the deterrence -- the

8  general deterrence has been really enormous.  He has received

9  some -- you know, this is a small community where he works, the

10  jewelry field, and they have their own newsletters, their own

11  information.  Everybody knows about this.  Individuals have

12  discussed this on the web.  They've contacted him.

13          I think that in terms of general deterrence, that's

14  clear.  I think that when his employees got involved in this,

15  that it was, again, it wasn't like he ordered his employees to

16  commit any illegal acts.  He sought the assistance of an

17  employee.  He was also really suffering.  This business, almost

18  third generation, was on the brink, and quite frankly is still

19  on the brink, of going into bankruptcy.  The losses he

20  suffered.  He supports 26 people, two of which are people who

21  aided him in these e-mails.

22          So, Judge, in terms of him getting others to get

23  involved in criminality, and I understand that's a concern.

24  This would be my concern too.  I would suggest to the Court

25  that it wasn't done with malicious intent.  And when you

IAJPARNS

1    brought up that statement just now, Judge, which really -- it

2    is mentioned in the presentence report about doing this, it's

3    also in, I believe, in the government's letter.

4            Judge, that's at the end of the day here.  I'm trying

5    to stress to the Court that what my client went through for

6    several years was this unbelievable attack on his integrity and

7    on his business.  He did everything he could, and again, I said

8    this to the government before you walked into the Court, what I

9    say here to you is not justification.  It's not justification.

10   I think what he did was wrong, improper and immoral.

11           This Court, Judge, just like everybody else sitting

12   here in the court, it's my temple too, and I respect its

13   sanctity, but this all happened at the end of the day.  He was

14   bombarded with click fraud.  I mentioned there was false coupon

15   fraud, which went on until just right before he got arrested

16   when this individual would post coupons on the web, get a

17   discount at the Natural Sapphire Company, and they would call

18   up and say, listen, I know I ordered something, but I have a

19   discount coupon.  And then they would say:  There is no coupon,

20   and that would breed some more negative information because he

21   never posted those coupons.

22           There was defamatory information on websites all over

23   the web.  There were comments.  It went on and on and on.  He

24   contacted the State Department.  He contacted his

25   Congressperson.  He called the FBI.  Judge, I have to say, the

IAJPARNS

1    FBI did make a good-faith effort to help him.  They even made,

2    with him, he made monitored phone calls to this individual,

3    with FBI agents, but they just didn't have the jurisdiction to

4    arrest that person and bring that person to justice.

5            He also hired a lawyer, who contacted law enforcement

6    officers in India to try to get this individual to stop his

7    conduct.  They couldn't do it or, quite frankly, they probably

8    wouldn't do it.  I think the FBI just couldn't do it.  He

9    contacted his lawyers to get the legal court orders here in

10   front of Judge Nathan.  He contacted a lawyer.  He paid the

11   lawyer.  You know, lawyers charge large fees.  He paid him I

12   think something in the nature of $75,000, and that doesn't

13   count all the employee time which was utilized to try and stop

14   this.

15           The loss of income he received because people were

16   reading negative reviews, they don't know if they're false or

17   fraudulent.  He spent $75,000 with the lawyer to get him to do

18   this.  The lawyer did it, was successful, had 54 URLs removed,

19   54, and then there was some others that popped up.  And by the

20   way, before the lawyer he hired the lawyer, he hired an IT

21   specialist.  They contacted Google.  They tried to reason with

22   Google to remove this, but Google has this policy, it's sort of

23   like a benign policy, we don't know what's truthful and not

24   truthful.

25           So it's out there in the web, which is billions of

IAJPARNS

sites.  Anybody can say anything about anybody, and the damage

being done to him, not just him but his business and his

employees, people that rely upon him every single day.  You saw

the letter, Judge, from the people in Sri Lanka.  That's real.

Those people struggle.  He paid them a good income and took

care of them.

He went out and hired a lawyer, had those URL's

removed.  They asked Google to do it a second time.  Because of

the order, they agreed to do it.  And then when these other

sites popped up, which had similar language, similar

information, Google refused to do it.  And he went to his

lawyer -- and I understand his lawyer's position -- and said

listen, we're going to need to get another court order.  And

his lawyer said, fine; these are the fees.

Just at that point, again, it was a terrible error in

judgment.  There's no question about it.  That's when that

statement arose.  That's when it happened.  That's when it was

sustained, after years and years of dealing with this and

paying for it and trying every legal way, through lawyers,

through Congresspeople, to law enforcement, even willing to go

ahead and, you know, and for lack of it, it evolved to try and

get this guy arrested, but it all failed, he did this.

So again, Judge, I don't say this as justification

because it's not.  But what it is, under 3553(a)(1), I think it

presents a case of mitigation.  Now, Judge, I hope that answers

IAJPARNS

1  your question because I think it's -- I want the Court to

2  understand that this is not someone who one day decided, you

3  know what, I got to -- I represent clients, I'm sure the Court

4  has too, who cut corners.  All right?  Whose initial instinct

5  is not to do the hard thing, it is to do things that are

6  illegal and improper.

7         He tried every means, and then at the end of the day,

8  he did something illegal and made that statement, which is --

9  which basically is sticking in his face now.  Maybe he's going

10 to -- and he's going to end up paying for it in a very serious

11 manner.  You know, a felony conviction, Judge, I try hard,

12 really hard with the government to try to get them to defer

13 prosecution.  They exercised their judgment, which is their

14 power, and they said no.

15        I tried to get him a misdemeanor.  Again, they refused

16 to do that, and I understand their position, Judge.  I

17 understand that, really, the issue here is of general

18 deterrence, but I want this Court to understand that this man

19 has clearly been deterred, both specifically -- specific

20 deterrence and generally.  This has been an ordeal, of which

21 now is of his making, there's no doubt about it, which has been

22 extraordinary.

23        I gave you the letter, Judge, from his lawyer, Brett

24 Lewis, and I asked him to sort of describe what went on.  I

25 have had numerous conversations with him as this matter was

IAJPARNS

1   going on, and he called this -- he called this to me, I think

2   he said this was the largest or the biggest economic terrorist

3   act he had seen in his practice.  This is what he does.  He

4   does internet law.

5        In furtherance of that, Judge -- again, this doesn't

6   answer your question, but it's really part of what I have to

7   say to the Court.  When we were contacted by the FBI, after he

8   was arrested and after he pled guilty, without a proffer

9   agreement, your Honor, without a proffer agreement, we spoke to

10  an FBI agent, who was interested in pursuing this brand.com,

11  but unfortunately, at least to date, that hasn't come to

12  fruition.  And it's not because he gave any false information.

13  I just don't think they've made the case.  Maybe his

14  information wasn't sufficient enough for them to rely just upon

15  his information.

16       But we've tried to do everything we can do to try and

17  right this wrong, which is a wrong.  There's no doubt about it.

18  I think if you look at his background, Judge, you know, you see

19  people frequently that come into court and they talk about

20  community service and the good acts that they do, and a lot of

21  times -- Judge, I'm a defense lawyer; I know how this works --

22  is that, you know, soon after or when they're being

23  investigated, all of a sudden, you know, the goodness comes

24  out.

25       This guy has been doing stuff for people for years and

IAJPARNS

1   some of it I didn't even know about until I wrote this

2   submission, particularly when it comes to the fact that he --

3   that he sponsor these runnings events in the Bronx, not in

4   Central Park, not for people who live in Manhattan, but for

5   kids who live in the Bronx to run.  And the people that can

6   afford these events, he asked them to bring canned goods and

7   clothes to give to others, and he was doing this for years.

8          When he ran the -- I think I put this in the letter.

9   When he ran the marathon -- by the way, Judge, I think I

10  brought this up in a bail application to have him travel, which

11  the court denied.  In his age group, he's a pretty renowned

12  marathon runner, and many years of running, after running the

13  New York Marathon in a very competitive fashion, he'd go back

14  to the race and there was an individual who had cerebral palsy.

15  He helped him cross the finish line.  He spent another three or

16  four hours pushing this guy over the line.

17         This is a really decent man who has worked hard in a

18  three-generation business, who was really being attacked, tried

19  to pursue legal means, and then made a terrible, terrible error

20  in judgment, which was immoral and illegal, and he accepts

21  responsibility for it.  So what I'm asking the Court to do is

22  not to -- general deterrence is a -- is, obviously, a goal,

23  Judge when the Court considers sentence.

24         It's something that I would consider always, but I

25  think, Judge, that this -- that he's paid for this in so many

IAJPARNS

ways, and I know that he's specifically deterred.  And I know

that there are many individuals, particularly people in this

courtroom, who know what happened.  His desire to aid the

government without any promise or proffer or agreement, I think

certainly shows an acceptance of responsibility, and I think

the general public is deterred from this conduct.

I don't deny that this is something that the

government is going to have to watch, but you know what else,

the government is also going to have to watch what goes on on

these websites and in Google.  It's open season on anybody and

anything, and people get negative things written about them all

the time and they can't do anything about it.  They can't do

anything about it.

You know, resorting to this is something that

shouldn't occur, and I think the message is out there that it

shouldn't occur.  And if you think that sending him to jail,

Judge, that putting him in a prison cell and basically putting

his company out of business, and 26 other people, you know, out

of jobs is the deterrence that you should -- that should be

shown him and the punishment, I just have to say, Judge, I

think that that's -- that's not the path the Court should take.

I think he there's a lot of good in this guy, and I

think that he continues to do good.  And I certainly believe --

I know he has prepared a statement, and Judge, I didn't prepare

the statement with him that he has to say to the Court, that I

IAJPARNS

1   hope the Court accepts and understands.

2           Judge, did I answer your question?

3           THE COURT:  About 75 percent of it.  My concern,

4   again, with general deterrence -- you got to it a little bit

5   more there towards the end.

6           MR. BROUNSTEIN:  Yes.

7           THE COURT:  Oftentimes general deterrence is sort of

8   an ethereal concept, and when I'm saying general deterrence,

9   I'm not talking about deterring Mr. Arnstein from generally

10  committing other crimes.

11          MR. BROUNSTEIN:  I understand that, your Honor.

12          THE COURT:  That's specific deterrence.

13          MR. BROUNSTEIN:  Right.

14          THE COURT:  Keeping him from committing this crime and

15  other crimes.

16          MR. BROUNSTEIN:  I understand that.

17          THE COURT:  When I'm talking about general deterrence,

18  I'm talking about deterring other people in the public from

19  committing this type of crime.  While that is often an ethereal

20  sort of subject, the e-mails that he sent seem to speak to the

21  need for general deterrence.

22          We're dealing with a situation in which you have

23  Mr. Arnstein, who runs his own business.  While a felony

24  conviction is a big deal, it won't keep him from being

25  employed.  It won't really cost him much.  Again, I'm not

IAJPARNS

saying that there aren't serious collateral consequences to a
felony conviction, but for someone who's self-employed, it's
very different than if he was an employee and has a federal
felony conviction would then have a hard time getting a job.

His e-mails, again, I'll read a couple of these
e-mails and excuse my blue language, but I'm quoting from the
e-mails here.  One of the e-mails that he sent:  "No bullshit.
If I could do it all over again, I would have found another
court order injunction for removal of links, probably something
that can be found online pretty easily, made changes and
Photoshopped" -- this is from Paragraph 12 of the presentence
report -- "to show the links that I wanted removed and then
sent the removals at Google.com and as a PDF showing the
court-ordered docket number, the judge's signature but with the
new links put in.  Google isn't checking this stuff.  That's
the bottom line because I spent $30,000 fuckin' dollars and
nearly two fuckin' years to do what legit could have been done
for about six hours of searching and Photoshop by a guy for
$200 all in one day."

Then, in paragraph 24, he sent an e-mail that says: "I
think you should take legal advice with a grain of salt.  I
spent a hundred thousand on lawyers to get a court order
injunction to have things removed from Google and YouTube, only
to Photoshop the documents for future use when new things
popped up, and Google legal never double-checked my docs for

IAJPARNS

1  validity.  I could have saved a hundred thousand and two years

2  of waiting, damage if I just used Photoshop and a few hours of

3  creative editing.  Lawyers are often worse than the criminals,"

4  and et cetera, and et cetera.

5        That is, to me, something that screams out even more

6  for general deterrence.  If the general public thinks, and as

7  you've said, this is an issue that happens frequently in

8  society, it seems to me that there's a need to deter people in

9  his position from making this cost-benefit analysis that he

10  made and saying, well, I'll save all this money.  I'll save all

11  this time, and I'll do it this way.

12        I'm not sure that simply sentencing him to no time in

13  jail and nothing else sends that message.  If we want people to

14  be able to have faith in court orders and take court orders

15  seriously, it seems to me that it may further diminish the

16  public's faith in those orders and in the judicial process if

17  judges don't seemingly take forging judicial orders seriously.

18  So can you respond to that?

19        MR. BROUNSTEIN:  I can, Judge, and I'll respond,

20  first, to what you said about his business and getting jobs.

21  Just so this Court is aware, and I said this before, Judge,

22  because of all this, these false statements, he's lost a

23  tremendous amount of business.  But also, as a result of this

24  felony conviction -- and I didn't include this letter because I

25  thought, quite frankly, I didn't want to, in a sense,

IAJPARNS

1    overburden my submission.

2           Because of this, he can't get insurance for his

3    business because he has this felony conviction.  His insurers

4    have walked away from him, and more importantly than that is

5    that in the jewelry business, it's a really kind of strange

6    business.  It's a handshake business, and people give you

7    hundreds of thousands, if not millions, of dollars' worth of

8    goods, and they just give it to you.  There's no contract.

9    It's a handshake agreement.  Because of the fact that they feel

10   that he could be going to jail, that is the end of it.  It's

11   cash on the barrel.  So his business has taken a turn.

12          And, Judge -- you know, look, Judge, I understand

13   those statements and I understand the Court's concerns, but I

14   want the Court to understand that those statements, those

15   statements came or the were the statements of not someone who

16   sat down in a chair and thought about what happened.  They were

17   reactive statements.  They were statements of frustration that

18   occurred after three years of battle with this issue, after

19   pursuing legal means.

20          So, Judge, I understand.  But in terms of general

21   deterrence, I certainly believe, your Honor, that individuals

22   are deterred when they realize that someone is arrested, that

23   someone is convicted and that someone pleads guilty and that

24   sending people to jail is not necess- -- it doesn't necessarily

25   further the Court's concern.  Everybody's concerned about

IAJPARNS

general deterrence, about this not happening again, but I want
the Court to understand that whatever way you feel about
deterrence, Judge, is that those statements do not reflect the
true nature, feeling and intent of my client.

They came after three years of -- and they were
statements of frustration.  Judge, there are many, many times
we all, as human beings, go through tough and difficult times
and make statements that -- or say -- now everything is more in
e-mails, that -- that are inappropriate, that are wrong and
that, viewed in a vacuum, in a vacuum, are, you know -- are
much worse than they are.

And again, Judge, I think that I understand general
deterrence, and I think that the Court -- that his arrest, and
what the court is going to do today certainly reflects an
overall concern of general deterrence.  And I think that there
are other factors for this Court to consider beyond that, and
again, Judge, I understand your concern because, quite frankly,
that was my -- you know, in thinking about it.  Every case I
do, I say to myself what would I think if I were ever lucky
enough to wear those robes, Judge?  And that's something that
would concern me, and I expressed that to my client, too.

But I think that others are deterred from this
conduct.  I think that his course and the way he's gone through
this real -- this trial, through all the years of dealing with
this and now ending up with a felony conviction, an arrest,

IAJPARNS

1    being humiliated and facing -- and the stress of what's cost

2    him his business, his family and friends, I think that's out

3    there.  And I think that's sufficient general deterrence for

4    others not to act in this manner.

5              And I certainly think, Judge, that the fact that my

6    client wanted to talk to the FBI indicates that he'd be willing

7    to communicate that to others as well.  So I think that the

8    public is deterred from this conduct, but again, Judge -- so

9    I'd ask you to consider all that, and I hope I've answered your

10   questions.

11             THE COURT:  Okay.  You have.

12             MR. BROUNSTEIN:  Thank you.

13             THE COURT:  Let me hear from the government.

14             MR. NOBLE:  Thank you, your Honor.

15             THE COURT:  Again, you can have a seat if you like.

16   Whatever you feel more comfortable doing.

17             MR. NOBLE:  I'm happy to stand, your Honor.

18             THE COURT:  Okay.

19             MR. NOBLE:  Mr. Arnstein's conduct was outrageous, and

20   defense counsel argues that a jail sentence isn't what's

21   necessary in order to achieve adequate deterrence, which your

22   Honor very articulately explained the reasons why general

23   deterrence is of utmost concern in this case.  But a jail

24   sentence in this type of white collar case is exactly what's

25   needed in order to deter others from committing this type of

IAJPARNS

1   crime.

2          I can represent to the Court, this conduct is

3   widespread.  In the course of this investigation, and others

4   that our office is conducting and other U.S. Attorney's Offices

5   are conducting, we've been in touch with Google and other

6   internet search engines.  And this conduct is rampant because,

7   as defense counsel represented, anybody can post essentially

8   anything on the Internet, and companies and individuals who

9   want to get it down, have to jump through certain hoops in

10  order to do so legitimately.

11         They have to go to court, get a court order and, yes,

12  that can be an expensive endeavor, but that's the law.  That's

13  the legal way to do it.  And if the message is not sent that

14  forging a court order in order to circumvent the legal way of

15  getting purportedly defamatory information from the Internet

16  removed, from search results, it's going to open the floodgates

17  to this type of conduct.

18         As Mr. Arnstein's case shows, and as he bragged about

19  in the e-mails to the other individuals, it was relatively easy

20  for him to take a legitimate court order from this District

21  Court, forge the other information in that order and send it to

22  Google.  And Google does endeavor to try to weed out fake court

23  orders because they are aware that this is a major problem.

24  However, Google, obviously, doesn't have all of the resources

25  to investigate every single submission that is sent that

IAJPARNS

contains what appears to be, on its face, a legitimate court order.

So, your Honor, what is necessary here, we submit, is a guidelines term of imprisonment to send a message to the public that this type of conduct, which is egregious, serious and represents a complete flouting of the rule of law and respect for the law, will not be tolerated; that it will receive substantial punishment, not just the collateral consequences that go along with pleading guilty and the impact, financial and otherwise, that it may have on a company or an individual but that you will do real prison time if you forge court orders in order to circumvent the legal process by which other individuals and businesses have to go through in order to get purportedly defamatory information removed from internet search results.

So we believe that, in this case, the paramount interest in sentencing is to achieve general deterrence, to reflect the seriousness of this offense, and to promote respect for the law.

I'd like to address just a couple of other arguments that defense counsel has raised.  First, Mr. Brounstein is arguing that he's not trying to justify the defendant's conduct, but by all accounts, by what I hear, that is exactly what he's trying to do.  They point to this business dispute that they had with -- that Mr. Arnstein and his company had

IAJPARNS

with a former business associate, but as their own sentencing

submission reflects, they were able to hire a lawyer to sue

that individual and his company in court and to obtain a court

order to remove the defamatory information.

Yes, that process costs money.  It's a cost of doing

business.  But they were successful, as they recognize.

Instead of continuing that process, continuing to remove or

attempt to remove the links through legal means, Mr. Arnstein

chose a shortcut.  He chose to forge court orders, and he

didn't just do it once.  It wasn't a single, brief lapse in

judgment.  He did it over the course of almost three years.  He

submitted 12 forged court orders to Google, all of which bore

the signature of a federal judge in this District Court.  That

type of conduct cannot be tolerated, and the fact that he was

having a business dispute is insufficient to explain why he

continued for three years to forge court orders.

Defense counsel also represents that the FBI

investigated, and he made a representation that the FBI's

investigation of the dispute between Mr. Arnstein and his

former business associate was dropped because we didn't have

jurisdiction.  That's not true.  The FBI investigated and

essentially concluded it was a he-said/he-said situation.

There was blame to be had on both sides in this business

dispute.

It was a civil business dispute, which is why it

IAJPARNS

1    should have been resolved in a civil court, in a court of law.

2    Instead, Mr. Arnstein resorted to illegal means to achieve the

3    same results, and he did it essentially to benefit his business

4    in two ways, we would submit.  One, it's to get what he

5    perceived as the defamatory information off the Internet; but,

6    two, he did it in order to save money.

7         The e-mails that your Honor just read show that

8    Mr. Arnstein was concerned about the cost of the legal means

9    and the attorneys' fees that he wanted to avoid in order to

10   benefit him and in order to benefit his business.  So we submit

11   this was a crime committed out of opportunity and out of greed.

12        Mr. Arnstein is a very privileged individual.  He's a

13   successful businessman.  He has a $1.5 million house in Hawaii.

14   He comfortably supports his wife and three children.  He has --

15   he lives a very healthy lifestyle apparently, running

16   marathons.  He did not have to commit this crime.  He has

17   $3 million in net assets.  He did this in order to avoid

18   hundreds of thousands of dollars, or potentially hundreds of

19   thousands of dollars in business, in legal fees.  But, your

20   Honor, we submit that's the cost of doing business.

21        It would be completely unfair for someone like

22   Mr. Arnstein to get away with a crime, to walk away without

23   serving a day in jail, when other companies, other individuals

24   are out there getting court orders, spending the amount of

25   money that they have to on legal fees in order to do it in a

IAJPARNS

legitimate way.  It would send exactly the wrong message to

society, to businesses, to people who will read about this

judgment.

        This case has gotten press attention, and they will

read about your Honor's decision here, and we believe this is a

unique opportunity to send a message because this is one of the

first times that this type of crime has been prosecuted.  There

are a number of investigations into this type of conduct

throughout the country.  It is an easy, as we said, crime to

commit, and your Honor has the opportunity to send a strong

message.

        So just to sum up, this was a crime of opportunity.

We submit it was driven by greed, and we believe that it cries

out for a guidelines term of imprisonment to send a strong

message that this type of conduct will not be tolerated, that

people have to play by the rules, that businesses have to play

by the rules, that you can't short circuit the legal system,

and that you can't commit an egregious crime like forging a

judge's signature, submitting fake court orders in order to

save a few bucks.

        So for those reasons, your Honor, we believe that a

guidelines term of imprisonment and a guidelines fine are both

appropriate here.

        MR. BROUNSTEIN:  May I respond, your Honor?

        THE COURT:  Yes.

IAJPARNS

1        MR. BROUNSTEIN:  Thank you, sir.  Your Honor, I think

2    the government would be completely correct in their statement

3    if they didn't -- they seem to ignore the fact that

4    Mr. Arnstein did avail himself to the legal process.  He came

5    to court.  He got court orders.  He did exactly the way he was

6    supposed to do it and paid again for --

7        THE COURT:  Hold on just a second.  Before you

8    continue, why does that make it better for him, the fact that

9    he actually went through the legal process, did this the right

10   way, knew that it could be done the right way, and then decided

11   to forge a judge's signature and submit a counterfeit order

12   essentially to save money?

13       MR. BROUNSTEIN:  Well, Judge, you say it's just to

14   save money, but with all due respect, your Honor, he's a small

15   businessman and the amount of money that he had, it was an

16   inheritance.  He had a struggling business.  It's not just to

17   save money.  It's to stop the bleeding and to pay his

18   employees.  He did everything he could not to fire people, and

19   unfortunately, he had to let people go during this time period.

20       So what I'm saying, Judge, I think it makes a

21   difference that the guy, he tried.  He went to court.  He got

22   the order.  He did whatever he needed to do.  He contacted

23   Google twice, and they agreed, and the third time they said go

24   back and hire your lawyer again and bring a court order.  So if

25   the Court doesn't think that that's important, well, Judge,

IAJPARNS

obviously, that's your call, that's your discretion and
decision.

But, your Honor, he did go to court.  He tried to do
it the legal way and then failed, and then made a terrible
error.  But he pursued a legal path.

In addition, what the government fails to understand
is that -- well, maybe I failed to mention, actually -- is that
beyond that, this individual that when they went to court, it
was a default judgment.  There was also a separate agreement
with this guy where he basically paid, and his lawyer put it in
the letter, a $75,000 payment to have him stop doing this, but
it continued.  It continued.

So he availed himself of the legal process.
Unfortunately, he didn't get the result that he sought and,
yeah, Judge, at that point, he bit into the poison apple.  So I
think that it showed -- as I said when we first started this
morning, it wasn't his original intent to go out and subvert
the system.  It came at the end of the day, and that's
something that he's paying for today, paying for with a felony
conviction, paying for by having the possibility of now, of
losing this business and having his employees lose their jobs.

So I think there's a lot of general deterrence out
there, and I just -- it just -- you know, the theory of general
deterrence, Judge, of punishing people, of punishing
individuals so other people, you know, wouldn't commit the same

IAJPARNS

1    act, and it really -- getting a tremendous amount out of an

2    individual making them pay beyond for what they did, I don't

3    know, Judge, to me, that seems, respectfully, a bit harsh.

4         I think sometimes it has to be done, but I think

5    that's achieved here, and putting this man in a jail cell

6    doesn't achieve that.  I mean, there are other things he can

7    do.  He can certainly go out and write about this and discuss

8    it in groups, do community service and talk about what he did

9    was wrong and avail himself to whoever needs to be spoken to

10   regarding this issue.

11        But also, and I said this before, is that what has to

12   be considered here, in some way or form, is that people -- is

13   that there's tons and tons of information.  People are being --

14   businesses and people are being defamed by others who are just

15   basically seeking either retribution or extortion or payment,

16   and nothing is being done about that.  I think that that's

17   really the crux of the letter that was written to you in that,

18   I guess, amicus letter.

19        So, Judge, I just think that a prison sentence, given

20   the entire history, the entire history, I just respectfully

21   think, Judge, it's unwarranted.  This is a decent man, who's

22   done decent things his whole life, and I think that he deserves

23   a second chance from the system, your Honor.

24        THE COURT:  Okay.  Mr. Arnstein, I'll give you an

25   opportunity to address me, if you'd like.  You don't have to

IAJPARNS

1    say anything, but if you'd like to, now is your opportunity.

2             All right.  Now, I see you standing to show respect

3    for the Court.  While I appreciate that, the acoustics here

4    aren't great.  It's probably more comfortable if you just lean

5    into the microphone like that, and I can hear everything you

6    have to say.  Go ahead.

7             THE DEFENDANT:  Yes, your Honor.  Your Honor, thank

8    you for allowing me to speak today.  My statement was written

9    and created solely in my own words.  These are my true

10   feelings.  I, Michael Arnstein, am here today to accept

11   responsibility for my actions and explain my sincere regrets to

12   this Court.

13            Over the last 18 months, since my arrest, I have had

14   many emotions through these proceedings.  At first, I was angry

15   and I looked to point the fingers at how others had taken

16   advantage of me, that my predicament was unfair and that I had

17   tried every legal way to stop the defamation, that I was simply

18   the victim.  I tried hard to deflect that what I did was at the

19   instruction of third party, that I shouldn't be responsible.

20            I did not want to admit to myself that I had fallen

21   far off course.  I'd become cynical and bitter in my struggle

22   to maintain my family name.  Upon reflecting over the last year

23   and a half, I have come to terms with what I did and how I feel

24   about it.  I allowed my mind to become corrupted.  I made many

25   excuses, had become reckless and irresponsible.  My mind became

IAJPARNS

broken in fear and anger.  In my aim to maintain my family name
and protect my job and jobs of others, I foolishly risked
everything, and now I have to pay dearly.

Your Honor, in my job for 22 years, I have traveled
very often to very poor countries in southeast Asia, where
gemstones are mined.  In these countries, I have seen and
compared the unimaginable differences between these countries
and America.  In my thinking about my predicament today and how
unpleasant of an experience it has been, I now find my
distilled thoughts focused on how fortunate I am to be an
American citizen.

Our systems of laws has created the greatest country
in the world.  The fact that I have the opportunity to be heard
today is something that I am grateful for.  In these other
countries that I often visit, there is very little respect for
law or justice.  Opportunity for advancement or protection is
fleeting at best.  The sadness of seeing these broken
governments and corrupt societies in so many times is one of
the reasons why I can honestly say I am both grateful and
remorseful to this Court, as I am before you.

My humble request is that you not consider mercy on me
specifically, but those who depend on my crucial position
within our company.  My greatest fear is not being able to meet
the commitments that I have made to others.

I've always been a provider not only to my family, but

IAJPARNS

1    to my community and my coworkers.  Most of the people that work

2    in our company are first-generation immigrants.  They work so,

3    so hard.  They are humble and honest.  They are family to me,

4    and I don't want to let them down.

5        All of our vendors are watching and waiting to hear of

6    my fate today.  Some will surely refuse to work with us if I am

7    incarcerated.  Already, many have refused to work with us

8    throughout these legal proceedings.

9        The stress on all of us has been tremendous.

10   Financially, our company has been devastated and continues to

11   be surreally challenged in lost sales with our poor online

12   reputation.  The company defense costs have exceeded $200,000.

13   Punishment for me is immense and will continue to be

14   debilitating long after my sentencing today.

15       My marital relationship has become stressed beyond

16   words.  My children are scared and in therapy.  Some of my

17   children's friends' parents have prevented them from coming to

18   our house since my arrest.  An online search of my name returns

19   pages of stories about my felony conviction to remove negative

20   reviews with little defense or relief that will be attainable

21   to my reputation.  The shame of personal identity will follow

22   any search for my name forever.

23       I sincerely ask you that you consider my coworkers and

24   family, who rely on me for livelihood.  I am in a position

25   where my daily involvement is, unfortunately, critical to their

IAJPARNS

1   family security.

2              My grandfather, who started our family business in

3   1939 had a sign on the wall in his office.  That sign said:

4   "Integrity doing the right thing when no one is looking."  Your

5   Honor, I failed in maintaining my grandfather's message in the

6   past.  I have rehung that sign on the wall above my desk as a

7   constant reminder to stay the course.  I humbly request that

8   you allow me to continue to serve those who depend on me.

9   Thank you.

10             THE COURT:  Okay.  Thank you.  I'll be back.

11             (Recess)

12             THE COURT:  All right.  Is there any reason why

13   sentence should not be imposed?

14             MR. NOBLE:  No, your Honor.

15             MR. BROUNSTEIN:  No, sir.

16             THE COURT:  Mr. Arnstein, are you satisfied with your

17   legal representation up to this point?

18             THE DEFENDANT:  Yes, I have been, your Honor.

19             THE COURT:  All right.  Restitution is not applicable

20   in this case.  Is the government seeking any forfeiture?

21             MR. NOBLE:  No, your Honor.

22             THE COURT:  I will impose the $100 mandatory special

23   assessment.  I will impose a fine of $20,000.  I have the

24   authority to depart from the guidelines downwardly or upwardly.

25   I have the authority to vary from the guidelines downwardly or

IAJPARNS

1    upwardly.

2              I have considered all of the factors in 18 U.S.C.

3    3553, and I am not going to depart from the guidelines nor will

4    I vary from the guidelines.  This is a case in which it's

5    important to promote respect for the law.  It's important to

6    generally deter people from committing this type of crime.  As

7    a society, we need people to respect the authority of the

8    judiciary and have faith in the legitimacy of judicial orders.

9              Mr. Arnstein exploited that faith to commit this

10   crime, and after exploiting that faith, sent e-mails bragging

11   about how easy it is to do it and how cost effective it is.  As

12   I indicated, there is a compelling reason for general

13   deterrence.

14             At the same time, there are other factors in 18 U.S.C.

15   3553, and I'm certainly mindful of the fact that Mr. Arnstein

16   is more than just his actions in this case.  Besides this, it

17   appears from the presentence report that he's led an otherwise

18   exemplary life.  He is supporting a wife and three children.

19   He runs a business, and these are all things that I have

20   considered.

21             I realize that jail is not a pleasant place, and it

22   will be very difficult for Mr. Arnstein to be in custody, but I

23   do believe that a period of custody is warranted here.  This

24   case is in zone C of the sentencing guidelines, which means

25   that part of the term of imprisonment can be satisfied by

IAJPARNS

1   imprisonment.  However, at least one-half of the minimum term

2   must be satisfied by imprisonment.

3          As I indicated before, the guideline range is ten to

4   16 months.  I believe that a total term of imprisonment, as

5   indicated by zone C, of 14 months is appropriate.  So I will

6   impose a sentence of nine months of custody, to be followed by

7   a term of three years' supervised release, with a special

8   condition of five months of home detention.

9          As I indicated, I will impose a fine as a condition of

10  supervised release.  I will impose the mandatory conditions

11  that Mr. Arnstein not commit another federal, state or local

12  crime.  He must not unlawfully possess a controlled substance.

13  He must refrain from any unlawful use of a controlled

14  substance.  He must submit to one drug test within 15 days of

15  release from imprisonment and at least two periodic drug tests

16  thereafter, as determined by the Court.  You must cooperate in

17  the collection of DNA, as directed by the probation officer.

18         I will also impose the standard conditions of

19  supervision as set forth on page 20 of the presentence report,

20  one through 13.

21         I will impose the following special conditions.  He

22  must submit his person, residence, place of business, vehicle

23  and any property, electronic devices under his control to a

24  search on the basis that the probation officer has reasonable

25  suspicion that contraband or evidence of a violation of the

IAJPARNS

1    conditions of his probation -- or of his supervised release,

2    rather, may be found.  The search must be conducted at a

3    reasonable time and a reasonable manner.  Failure to submit to

4    a search may be grounds for revocation.  You must inform any

5    other residents that the premises may be subject to search

6    pursuant to this condition.

7         He should be supervised by his district of residence.

8    I will also impose the special condition that he complete,

9    within the period of supervised release, 200 hours of community

10   service.

11        That is the sentence of the Court.  Before I advise

12   Mr. Arnstein -- well, I guess before that, are there any open

13   counts, counsel for the government?

14        MR. NOBLE:  No, there aren't.  He pled to an

15   information, your Honor.

16        THE COURT:  Is there anything else before I advise

17   Mr. Arnstein about his right to appeal?

18        MR. NOBLE:  Not from the government.

19        THE COURT:  From the defense?

20        MR. BROUNSTEIN:  Just an application for him to

21   surrender.

22        THE COURT:  All right.  Mr. Arnstein, that is the

23   sentence of the Court.  You have a right to appeal from your

24   conviction, including an appeal to the sentence imposed, except

25   to whatever extent you may have validly waived that as part of

IAJPARNS

1   your plea agreement.  You should talk to your lawyer about your

2   right to appeal.  There are time constraints on your ability to

3   file a notice of appeal.  If you cannot afford to hire an

4   attorney to help you prosecute the appeal, the Court would give

5   you an attorney free of charge.  Do you understand?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Yes, counsel, what's your recommendation

8   in terms of --

9          MR. BROUNSTEIN:  I have two, two requests, your Honor.

10   I ask that he be allowed to surrender in the third week of

11   January, which is approximately ten weeks, and I ask that the

12   Court recommend that he be incarcerated at the camp in

13   Otisville, New York.

14          THE COURT:  Okay.  Counsel for the government, any

15   position on that?

16          MR. NOBLE:  We have no objection to self-surrender.

17   He's been complying with his bail conditions since arrest.  And

18   we leave it to your Honor's discretion as to a recommendation

19   for BOP facility.

20          THE COURT:  Let me just find out from defense counsel,

21   this recommendation that you want me to make for Otisville, is

22   that based on location or something else?

23          MR. BROUNSTEIN:  Yes, your Honor.  It's close to the

24   New York area, where his employees and friends and family live.

25   That's the basis for the recommendation.

IAJPARNS

1          THE COURT:  Okay.  The reason I ask that is it may be

2    better for me to simply recommend that he be incarcerated in a

3    facility as close to the New York City Metropolitan area as

4    possible.  If you want me to specifically recommend Otisville,

5    I will, but it may be easier for me to recommend just a

6    facility as close to the New York City Metropolitan area as

7    possible, which would include Otisville, as well as --

8          MR. BROUNSTEIN:  I understand that, Judge, but we had

9    discussed it before, and we ask the Court to recommend

10   Otisville.  Again, obviously, it's a recommendation, and BOP

11   does what they think is appropriate for it.

12         THE COURT:  Okay.  I will recommend that he be

13   incarcerated at FCI Otisville, and I will give him a surrender

14   date of Thursday -- you said the third week of January,

15   counsel?

16         MR. BROUNSTEIN:  Yes, your Honor.

17         THE COURT:  Thursday, January 17th, 2019.

18         Is there anything else from the government?

19         MR. NOBLE:  No, your Honor.

20         THE COURT:  Anything else from the defense?

21         MR. BROUNSTEIN:  I'm sorry, your Honor.  I didn't

22   hear.  My client was speaking to me.

23         THE COURT:  Anything else from the defense?

24         MR. BROUNSTEIN:  No.

25         THE COURT:  Okay.  That is the sentence of the Court.
             (Adjourned)